IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONALD FLYNN,** | : | |
| **Plaintiff** | : | |
| | : | **No. 3:12-cv-1535** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **DEPARTMENT OF** | : | |
| **CORRECTIONS,** *et al.*, | : | |
| **Defendants** | : | |

## MEMORANDUM

This matter is before the Court pursuant to the motion for summary judgment (Doc. No. 118) filed by Defendants Thomas Williams ("Williams"), Charles Stetler ("Stetler"), and Lieutenant Shipe ("Shipe"). The motion is fully briefed and ripe for disposition.

## I. PROCEDURAL BACKGROUND

Plaintiff Donald Flynn ("Plaintiff"), then proceeding *pro se*, initiated the above-captioned case on August 8, 2012 by filing a complaint pursuant to 42 U.S.C. § 1983 against numerous Defendants concerning events alleged to have occurred during his incarceration at the State Correctional Institution in Coal Township, Pennsylvania ("SCI Coal Township"). (Doc. No. 1.) In an Order dated August 26, 2013, the late Honorable Richard Conaboy granted Defendants' motion to partially dismiss Plaintiff's complaint and noted that the above-captioned case would go forward on the following claims: (1) mail interference by Defendant Jellen; (2)

retaliation by Defendants Stetler, Shipe, Long, and Varano; (3) improper seizure of legal materials by Defendants Nowell and Long; and (4) the Psychiatric Observation Cell ("POC")-related claims against Defendants Stetler and Shipe.  (Doc. No. 33.)

The remaining Defendants subsequently filed a motion for summary judgment.  (Doc. No. 39.)  In a Memorandum and Order dated February 3, 2015, Judge Conaboy granted summary judgment with respect to Plaintiff's claims against Defendant Jellen and as to Plaintiff's POC-related claims on the basis that Plaintiff had not exhausted his administrative remedies.  (Doc. Nos. 64, 65.)  The motion was denied with respect to Plaintiff's remaining claims, and Judge Conaboy invited the parties to file additional dispositive motions.  (*Id.*)

Defendants Long, Nowell, Shipe, Stetler, and Varano filed a second motion for summary judgment on April 14, 2015.  (Doc. No. 68.)  In a Memorandum and Order dated March 4, 2016, Judge Conaboy granted the motion on the basis that Plaintiff had not properly exhausted his administrative remedies with respect to his remaining claims.  (Doc. Nos. 78, 79.)  Plaintiff filed a timely notice of appeal.  (Doc. No. 81.)  In 2018, the United States Court of Appeals for the Third Circuit affirmed in part and vacated in part this Court's judgment.  *Flynn v. Dep't of Corr.*, 739 F. App'x 132, 133 (3d Cir. 2018).  The Third Circuit concluded that: (1) the Court had erred by not permitting Plaintiff to amend his complaint to set forth a plausible

2

retaliation claim against Defendant Williams; and (2) remand was necessary for this Court to consider whether administrative remedies were available to Plaintiff with respect to his claims regarding the POC cell against Defendants Stetler and Shipe. *Id.* at 135.  The Third Circuit affirmed this Court's judgment in all other respects. *Id.* at 139.  The Third Circuit also directed that this Court appoint counsel to represent Plaintiff in further proceedings upon remand.  *Id.*

Upon remand, counsel appeared to represent Plaintiff, and the above-captioned case was reassigned to the undersigned after Judge Conaboy's passing. Plaintiff subsequently filed an amended complaint against Defendants Williams, Stetler, and Shipe.  (Doc. No. 95.)  Defendants filed a partial motion to dismiss, seeking the dismissal of Plaintiff's retaliation claim against Defendant Williams. (Doc. No. 99.)  In a Memorandum and Order dated January 27, 2020, the Court denied the partial motion to dismiss.  (Doc. Nos. 102, 103.)  The Court subsequently entered a case management order (Doc. No. 110) and granted the parties extensions of time to complete discovery and to file dispositive motions (Doc. Nos. 112, 113, 115, 116.)  Defendants filed their motion for summary judgment on December 3, 2020.  (Doc. No. 118.)  All pretrial case management deadlines have been continued generally pending disposition of Defendants' motion.  (Doc. No. 122.)

## II.    SUMMARY OF PLAINTIFF'S AMENDED COMPLAINT

During Plaintiff's incarceration, prison officials "shut off the telephones while Plaintiff was speaking on the telephone using pre-paid phone time" on multiple occasions.  (Doc. No. 95 ¶ 8.)  He "did not recover the pre-paid phone time and had to use additional funds to complete the terminated calls."  (*Id.* ¶ 9.)  He used the Inmate Grievance System to "complain of the deficiencies in the prison phone system."  (*Id.* ¶ 10.)  Specifically, he filed Grievance Nos. 369816 and 373906.  (*Id.* ¶ 11.)  Plaintiff alleges that on September 27, 2011, Defendant Williams issued him Misconduct B067662 as retaliation for Plaintiff's grievances.  (*Id.* ¶ 12.)  Defendant Williams "issued a report falsely stating that Plaintiff had pled guilty to Misconduct B067662 for events occurring on September 16, 2011."  (*Id.* ¶ 13.)  Plaintiff "was sanctioned with fourteen (14) days loss of phone privileges beginning on September 27, 2011."  (*Id.* ¶ 14.)

On October 19, 2011, Plaintiff was confined to the Restricted Housing Unit ("RHU") at SCI Coal Township.  (*Id.* ¶ 15.)  Before and during the course of his confinement in the RHU, Plaintiff received several misconducts, "allegedly based on the results of searching Plaintiff's confiscated property on October 19, 2011."  (*Id.* ¶ 16.)  He remained in the RHU until October 21, 2011.  (*Id.* ¶ 17.)  The RHU "consisted of a dry Psychiatric Observation Cell."  (*Id.* ¶ 18.)  While in the dry POC

4

Plaintiff "was denied water, personal hygiene supplies, clothing, and proper medical care." (*Id.* ¶ 19.) Plaintiff "became ill, vomited, and lay in his own vomit for some of the time Plaintiff spent" in the dry POC. (*Id.* ¶ 20.) He told Defendants Stetler and Shipe that he was sick, but they took no action to get medical help despite observing Plaintiff vomit on himself. (*Id.* ¶¶ 21-22.)

Based on the foregoing, Plaintiff alleges that Defendant Williams violated his First Amendment rights by retaliating against him for filing grievances, and that Defendants Stetler and Shipe violated his Eighth Amendment rights to be free from cruel and unusual punishment. (*Id.* ¶¶ 33-46.) Plaintiff seeks declaratory relief, damages, and attorneys' fees and costs. (*Id.* at 7.)

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric*

6

*Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party.  *White*, 826 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  *Id.* (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1.

## IV.   STATEMENT OF MATERIAL FACTS[1]

### A.   Facts Regarding First Amendment Claim

In 2011, while Plaintiff was incarcerated at SCI Coal Township, "prison officials shut off the telephone while he was using it on multiple occasions." (Doc. No. 120 ¶ 12.)[2]  Plaintiff filed Grievance Nos. 369816 and 373906 "regarding issues with the prison phone system." (*Id.* ¶ 13.)  In Grievance No. 369816, dated June 11, 2011, Plaintiff claimed "his phone call to a local number was 'cut off for no reason' and he was charged for the call." (*Id.* ¶ 14.)  On June 28, 2011, Lieutenant Feese issued a response denying Grievance No. 369816. (*Id.* ¶ 16.)  His response cited "Department policy (DC-ADM 818) that states the institution will not reimburse inmates for local cell phone calls." (*Id.*)  The denial of this grievance was upheld by the Facility Manager on July 7, 2011. (*Id.* ¶ 17.)  On August 2, 2011, the Secretary's

---

[1] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements. *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. *See id.*  Here, Plaintiff has filed a response to Defendants' statement of material facts in compliance with M.D. Pa. L.R. 56.1.  Accordingly, the Court sets forth the undisputed facts above with footnotes setting forth the parties' relevant factual disputes.

[2] Plaintiff clarifies that officials "shut off the telephones while Plaintiff was speaking on the telephone using pre-paid phone time." (Doc. No. 124 ¶ 12.)  He "did not recover the pre-paid phone time and had to use additional funds to complete the terminate calls." (*Id.*)

Office of Inmate Grievances and Appeals ("SOIGA") upheld the denial of the grievance. (*Id.* ¶ 18.) Defendant Williams was on the distribution list for the Facility Manager's response to Grievance No. 369816. (*Id.* ¶ 19.)[3]

In Grievance No. 373906, which was dated July 18, 2011, Plaintiff "claimed his phone call was terminated for no reason and he was charged for the call." (*Id.* ¶ 20.) Plaintiff "did not name any staff member in this grievance." (*Id.* ¶ 21.) Lieutenant Feese denied the grievance on July 10, 2011, "noting this was [Plaintiff's] second grievance regarding the same issue and again cited to DOC policy DC-ADM 818." (*Id.* ¶ 22.) The Facility Manager and SOIGA upheld the denial of this grievance on August 16, 2011 and September 27, 2011, respectively. (*Id.* ¶¶ 23-24.)[4]

Plaintiff avers that Defendant Williams "issued Misconduct No. B067662 in retaliation for Grievance Nos. 369816 and 373906, and falsely reported that he pled

---

[3] Defendants state that Defendant Williams was "not on the distribution list for the initial response or the final review response." (Doc. No. 120 ¶ 19.) Plaintiff, however, avers that "other designations on the distribution list were accessible by Defendant Williams, such as the 'File' designation." (Doc. No. 124 ¶ 19.)

[4] Defendants state that Defendant Williams "was not on the distribution list for any of the responses to Grievance No. 373906." (Doc. No. 120 ¶ 25.) Plaintiff avers that "other designations on the distribution list were accessible by Defendant Williams, such as the 'File' designation." (Doc. No. 124 ¶ 25.)

guilty to this misconduct." (*Id.* ¶ 26.)[5]  Officer Slodysko issued Misconduct No. B067662 on September 16, 2011. (*Id.* ¶ 27.)  He "was not named in Grievance No. 369816 or Grievance No. 373906, nor was he on the distribution list for any of the responses thereto." (*Id.* ¶ 28.)  Officer Slodysko saw Plaintiff and another inmate, Marcus Henderson, "swapping phone calls" and "ordered them to hang up the phones." (*Id.* ¶ 29.)[6]  Both Plaintiff and Henderson "were issued misconducts for refusing to obey an order and unauthorized use of the phones." (*Id.* ¶ 30.)[7]  He referred the misconducts to the unit manager for informal resolution. (*Id.* ¶ 31.)

Under DOC policy DC-ADM 801, "if an inmate violates Department rules and regulations, the violation shall be reported and disposed of by either an informal or formal process." (*Id.* ¶ 32.)  "The informal resolution process is to be used for

---

[5] Plaintiff admits to this fact and provides further explanation. (Doc. No. 124 ¶ 26.)  He states that the Informal Resolution Action Form bearing his signature "does not have any guilty plea on it" and "only summarizes the sanctions imposed on [him] for the misconduct." (*Id.*)  According to Plaintiff, Defendant Williams gave him "a copy of Misconduct B067662 along with the Disciplinary Hearing Report that already had the guilty plea and sanctions typed and handwritten, though [Plaintiff] had not pled guilty to the misconduct." (*Id.*)  "The 'findings of fact, verdict, and sanctions imposed' appear on a separate document titled 'Disciplinary Hearing Report,' with typewritten text reading: 'INFORMAL RESOLUTION HEARING HELD THIS DATE INMATE PLEADS GUILTY TO CHARGES,' with '14 days loss of phone 9/27-11—10/10/11' handwritten as the 'SANCTION' to impose." (*Id.*)  Plaintiff avers that Defendant Williams "confirmed that the 'Information Resolution Action Form' and the 'Disciplinary Hearing Report' are provided to inmates like [Plaintiff] at different points in time and [Plaintiff] would not have seen the 'Disciplinary Hearing Report' at the time he signed the 'Informal Resolution Action Form.'" (*Id.*)

[6] Plaintiff argues that these "are unsupported allegations only and Plaintiff denies the same." (*Id.* ¶ 29.)

[7] Plaintiff clarifies that he "was issued the misconduct but denies any wrongdoing." (*Id.* ¶ 30.)

violations considered to be less serious in nature." (*Id.*)  When a misconduct is referred for informal resolution, "an informal resolution meeting is scheduled with the inmate." (*Id.* ¶ 36.)  A hearing "will not be conducted on the charges." (*Id.*)  At this meeting," the unit manager/designee may issue one of the sanctions outlined in DC-ADM 801.  One such sanction is 14 days loss of a specified privilege." (*Id.* ¶ 34.)  The inmate may decline to participate in the informal resolution process; if this occurs, "the matter will be forwarded to the Hearing Examiner for formal resolution." (*Id.* ¶ 35.)  "Completion of the informal resolution process does not require the inmate to formally enter a guilty plea to the charges; however, to resolve the matter informally, his acceptance of responsibility is implicit in his acceptance of the sanctions." (*Id.* ¶ 36.)[8]  "For the purposes of parole and pre-release, informal resolutions are not considered misconducts." (*Id.* ¶ 37.)

Defendant Williams, Plaintiff's unit manager, "handled the informal resolution process for Misconduct No. B067662." (*Id.* ¶ 38.)  At the informal resolution meeting on September 27, 2011, Plaintiff "signed the informal resolution action form, thereby acknowledging he had been sanctioned to 14 days loss of phone

---

[8] Plaintiff denies these facts, stating that "DC-ADM 801 is a document which speaks for itself and Plaintiff denies any characterizations inconsistent therewith." (Doc. No. 124 ¶¶ 32-36.)  He also avers that "Defendant Williams' testimony indicated that an inmate could accept a sanction without a plea of guilty." (*Id.* ¶ 36.)

privileges." (*Id.* ¶ 39.)[9]  Defendant Williams "also handled inmate Henderson's informal resolution meeting on September 27, 2011, at which time he imposed the sanction of 14 days loss of phone privileges." (*Id.* ¶ 40.)

"Pursuant to DOC policy, DC-ADM 804, Section 1, a grievance related to inmate discipline/misconduct procedures will not be addressed through the Inmate Grievance process and must be addressed through policy DC-ADM 801, 'Inmate Discipline.'" (*Id.* ¶ 41.)[10]  Under DC-ADM 801, "the inmate may appeal the informal resolution process." (*Id.* ¶ 42.)  The appeal process is outlined in Section 5 and "requires the inmate to complete three levels of appeal." (*Id.* ¶ 43.)  The first level of appeal is to the Program Review Committee ("PRC") "for initial review within 15 calendar days of the hearing or informal resolution." (*Id.* ¶ 44.)  Next, the inmate "may appeal the PRC's decision to the institution's Facility Manager within 7 calendar days of receipt of the written decision by the PRC." (*Id.*)  The "final level

---

[9] Defendants state that in his amended complaint, Plaintiff "does not aver any facts indicating he denied the underlying conduct alleged in the misconduct report—namely, phone swapping—or that he was in anyway forced to sign the form." (Doc. No. 120 ¶ 39.)  Plaintiff, however, denies these statements pursuant to paragraph 26 of his response to the statement of facts, set forth *supra*. (Doc. No. 124 ¶ 39.)

[10] Plaintiff denies this, stating that "DC-ADM 801 is a document which speaks for itself and Plaintiff denies any characterizations inconsistent therewith." (*Id.* ¶ 41.)

of appeal is to the Chief Hearing Examiner within 7 calendar days of receipt of the Facility Manager's decision." (*Id.*)[11]

"The informal resolution documents reflect that Defendant Williams advised [Plaintiff] that he had 15 days in which to request a review of the misconduct proceedings." (*Id.* ¶ 45.) Moreover, "the DOC's Inmate Handbook provides inmates with notice of the Inmate Discipline Policy (DC-ADM 801) and the Grievance Policy (DC-ADM 804)." (*Id.* ¶ 46.) Inmates are "advised of the requirements they must meet when grieving their issues through the Grievance Policy and appealing misconduct determinations through the Inmate Discipline Policy." (*Id.*) Plaintiff's "misconduct records demonstrate that he utilized the misconduct review process on a number of occasions." (*Id.* ¶ 47.) "According to DOC records, [Plaintiff] did not file an appeal regarding Misconduct No. B067662." (*Id.* ¶ 48.)

### B.    Facts Regarding Eighth Amendment Claim

On October 19, 2011, Plaintiff "was issued Misconduct No. B429436." (*Id.* ¶ 50.) While conducting a search of Plaintiff, staff members "observed an object in his mouth, and he was ordered to hand it to staff." (*Id.*) Plaintiff "handed staff two pieces of paper and then appeared to swallow the other object. As a result, [Plaintiff]

---

[11] Plaintiff denies these facts, stating that DC-ADM 801 "provides that an inmate may appeal an informal resolution 'only in those cases where the inmate believes that the sanction is disproportionate to the offense.'" (*Id.* ¶¶ 42-45.) He also notes that DC-ADM 801 "speaks for itself and Plaintiff denies any characterizations inconsistent therewith." (*Id.*)

was issued a misconduct for refusing to obey an order." (*Id.*)[12] Plaintiff "was sanctioned to 60 days in disciplinary confinement for Misconduct No. B429436, with an effective date of October 19, 2011." (*Id.* ¶ 51.) He was placed in a dry cell for 72 hours for observation upon issuance of the misconduct because he was suspected of swallowing contraband. (*Id.*)

POC cells "are located within the institution's medical department." (*Id.* ¶ 52.) "Inmates in these cells are regularly monitored by medical staff. The cells are equipped with cameras and a call button that the inmate may use to speak to corrections officers and nursing staff." (*Id.*) POCs "are not used solely for psychiatric purposes." (*Id.*) They are often "utilized as a dry cell at SCI Coal Township and other institutions" because dry cells are required to have camera surveillance and POC cells "have 24-hour camera surveillance and one-on-one observation." (*Id.* ¶ 53.) "If an inmate is suspected of ingesting contraband, he will be placed in a dry cell to prevent him from concealing contraband that may eventually pass through his system." (*Id.* ¶ 54.) "Accordingly, in a dry cell the water is turned off and the toilet is covered to prevent usage. DOC policy outlines the procedures for inmates to regularly be offered water, use of a restroom, and an opportunity for exercise." (*Id.* ¶ 55.)

---

[12] Plaintiff admits to receiving the misconduct but denies the allegations therein. (*Id.* ¶ 50.)

Plaintiff's Eighth Amendment claim "is predicated upon his assertion that while he was confined in a dry cell (a POC), Defendants Stetler and Shipe denied him water, personal hygiene supplies, clothing and proper medical care." (*Id.* ¶ 56.)[13] Plaintiff "claims that he vomited and then laid in his own vomit 'for some of the time' he was in the dry cell." (*Id.* ¶ 57.) Plaintiff "does not indicate specifically when this occurred over the course of October 19-21, 2011." (*Id.* ¶ 58.)

In October of 2011, "Defendants Stetler and Shipe were assigned to the security office at SCI-Coal Township." (*Id.* ¶ 59.) "The security office is responsible for the internal security of the institution and for conducting investigations into criminal activity." (*Id.* ¶ 60.) In October 2011, Defendant Shipe was a lieutenant in the security office, and Defendant Stetler was the intelligence gathering captain. (*Id.* ¶¶ 61-62.) "As part of their investigation into Misconduct No. B429436, Defendants Stetler and Shipe interviewed Flynn in the medical conference room." (*Id.* ¶ 63.)[14] Plaintiff "claims he informs Defendants Stetler and

---

[13] Plaintiff admits this fact and provides clarification. (*Id.* ¶ 56.) He states that he "informed Defendants Stetler and Shipe that he was sick, and Defendants Stetler and Shipe observed Plaintiff vomit on himself." (*Id.*) "Defendants Stetler and Shipe took no action to get Plaintiff medical help; instead, Defendants placed Plaintiff back in the P.O.C." (*Id.*)

[14] Plaintiff avers that Defendant Stetler has no recollection of the interview and that "while Defendant Shipe testified that he believed it was a medical conference room, he could not recall where Plaintiff was placed following the vomit incident." (*Id.* ¶ 63.) "Thus, there is not ample evidence to support this assertion and the interview could have [taken] place in a cell." (*Id.*)

Shipe that he was sick, and they observed him vomit, following which they returned him to the cell and 'took no action to get Plaintiff medical help.'" (*Id.* ¶ 64.) He "claims he 'faced a serious medical need' at that time and he was 'deprived' of his 'right to seek medical attention.'" (*Id.*) "However, he does not aver that he requested medical attention." (*Id.*)[15]

Inmates "are made aware of the procedures to request medical treatment via the sick call procedures." (*Id.* ¶ 65.) "When an inmate requests medical attention, corrections staff contacts the medical department." (*Id.*)[16] Defendant Stetler "indicated that when an inmate requests medical attention, he does not exercise discretion or attempt to assess whether the inmate needs medical attention because that is not his decision to make." (*Id.* ¶ 66.) He further testified "that he could not recall any time that an inmate requested medical attention and he did not contact the medical staff for him." (*Id.*)

On October 22, 2011, Plaintiff filed Grievance No. 386960, claiming that while housed in the POC, "he vomited in the presence of Defendants Stetler and Shipe, following which he was not permitted to wash his hands or face and remained

---

[15] Plaintiff states that his complaint "is a document which speaks for itself and any characterizations inconsistent therewith are denied." (*Id.* ¶ 64.) He refers the Court to paragraph 63 in his response, as set forth *supra*. (*Id.*)

[16] Plaintiff denies these facts, referring the Court to paragraph 63, as set forth *supra*. (*Id.* ¶ 65.)

in the same smock." (*Id.* ¶ 67.)  Upon initial review, grievance officer Major Miller denied the grievance.  (*Id.* ¶ 68.)  His findings "indicated that [Plaintiff] had been placed in a dry cell for 72 hours pursuant to policy, upon suspicion of consuming a controlled substance.  He determined that staff followed the dry cell guidelines in policy, with respect to what items are permitted in these cells." (*Id.*)[17]  Plaintiff's appeal to the Facility Manager was denied, and his appeal to SOIGA "was dismissed for failure to comply with grievance submission procedures." (*Id.* ¶ 69.)

Major Miller interviewed Defendants Stetler and Shipe regarding Plaintiff's allegations.  (*Id.* ¶ 70.)  They "stated that when [Plaintiff] said, 'I'm going to be sick,' they provided him with a garbage can into which he vomited.  Also, they provided [Plaintiff] with material to clean his face and hands." (*Id.*)[18]  Defendant Shipe "recalled when [Plaintiff] was sick that it did not appear to be 'projectile vomiting with food and stomach acid,' but rather 'liquid or spit or something.'" (*Id.* ¶ 71.)  Plaintiff "did not get any vomit/spit on his clothing or anything else." (*Id.* ¶ 72.)  Defendants "Stetler and Shipe provided him with the trash can before he

---

[17] Plaintiff denies this, stating that Defendants "are paraphrasing from documents which speak for themselves and any characterizations inconsistent therewith are denied." (*Id.* ¶ 68.)

[18] Plaintiff denies this, stating that Defendants "are paraphrasing from documents which speak for themselves and any characterizations inconsistent therewith are denied." (*Id.* ¶ 70.)

17

started to spit up so that it would not get on the table or floor of the conference room. [Plaintiff] was not lying in or sitting in vomit in their presence." (*Id.*)[19]

On October 19, 2011, Plaintiff arrived at the medical department to be housed in the dry cell. (*Id.* ¶ 73.) At this time, "medical staff did not observe any signs of distress and noted [Plaintiff] was 'smiling while answering questions.'" (*Id.*) On this day, Plaintiff "was seen by medical staff on 3 occasions." (*Id.* ¶ 74.) "Records indicate the medical staff did not observe any signs of distress, nor is there any indication that any concerns were voiced by [Plaintiff]. It was further noted that he was observed 'resting quietly in bed.'" (*Id.*) Plaintiff was seen by medical staff "8 times throughout the course of the day" on October 20, 2011. (*Id.* ¶ 75.) Again, Plaintiff did not voice any concerns and medical staff "did not note any signs of distress." (*Id.*) He was again observed "resting quietly in bed." (*Id.*) On October 21, 2011, Plaintiff "was seen by medical staff on 2 occasions before he was transferred to the Restricted Housing Unit by security staff." (*Id.* ¶ 76.) "Again, medical staff did not note any signs of distress or any concerns voiced by [Plaintiff]. It was further noted that he was observed resting quietly that day." (*Id.*) Plaintiff's medical records reflect that he was seen by medical staff "on 13 separate occasions while he was housed in the medical department in a dry cell from October 19-21,

---

[19] Plaintiff denies this, relying on paragraph 63, as set forth *supra*. (Doc. No. 124 ¶ 72.)

2011."  (*Id.* ¶ 77.)  "Over the course of these 72 hours, the records indicate there were 'no complaints voiced' by [Plaintiff]."  (*Id.*)[20]

## V.    DISCUSSION

Defendants maintain that they are entitled to summary judgment because: (1) the record is devoid of evidence from which a reasonable factfinder could conclude that Defendants Stetler and Shipe violated Plaintiff's Eighth Amendment rights; (2) the record is devoid of evidence from which a reasonable factfinder could conclude that Defendant Williams violated Plaintiff's First Amendment rights; and (3) Plaintiff failed to properly exhaust his administrative remedies as to his retaliation claim.  (Doc. No. 119 at 2.)  The Court considers these arguments below.

### A.    First Amendment Retaliation Claim

#### 1.    Administrative Exhaustion

Pursuant to the Prison Litigation Reform Act ("PLRA"), a prisoner must pursue all available avenues of relief through the applicable grievance system before initiating a federal civil rights action.  *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").  Section 1997e

---

[20] Plaintiff denies these facts, stating that Defendants are "paraphrasing from documents which speak for themselves and any characterizations inconsistent therewith are denied."  (*Id.* ¶¶ 73-77.)

provides, in relevant part, that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other [f]ederal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *See* 42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory.  *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth*, 532 U.S. at 742 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures").

The Circuit has further provided that there is no futility exception to Section 1997e's exhaustion requirement.  *See Nyhuis v. Reno*, 204 F.3d 65, 75-76 (3d Cir. 2000).  Courts have typically required across-the-board exhaustion by inmates seeking to pursue claims in federal court.  *See id.*  Additionally, courts have interpreted this exhaustion requirement as including a procedural default component, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding with a claim in federal court.  *See Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004); *see also Oriakhi v. United States*, 165 F. App'x 991, 993 (3d Cir. 2006) (providing that "there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal

court").  Courts have also concluded that inmates who fail to complete the prison grievance process in a full and timely manner are barred from subsequently litigating claims in federal court. *See, e.g., Bolla v. Strickland*, 304 F. App'x 22 (3d Cir. 2008).

This broad rule favoring full exhaustion allows for a narrowly-defined exception; if the actions of prison officials directly caused the inmate's procedural default as to a grievance, the inmate will not be required to comply strictly with this exhaustion requirement. *See Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). However, courts also recognize a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." *See Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will be excused only "under certain limited circumstances," *see Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." *See Warman*, 49 F. App'x at 368.

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances warranting a departure from strict compliance with the exhaustion requirement, courts frequently reject inmate requests for their failure to exhaust to be excused.  An inmate, therefore, may not

excuse a failure to comply with these grievance procedures in a timely manner by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. *See Harris*, 149 F. App'x at 59. Furthermore, an inmate may not avoid this exhaustion requirement by merely alleging that the administrative policies were not clearly explained to him. *See Warman*, 49 F. App'x at 368. Consequently, an inmate's confusion regarding these grievances procedures does not, alone, excuse a failure to exhaust. *See Casey v. Smith*, 71 F. App'x 916 (3d Cir. 2003); *see also Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) ("[I]t is well established that 'ignorance of the law, even for an incarcerated *pro se* petitioner, generally does not excuse prompt filing.'" (citations omitted)).

Recently, the Supreme Court considered what renders administrative remedies unavailable to an inmate such that a failure to exhaust may be excused. *See Ross v. Blake*, 136 S. Ct. 1850 (2016). The Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *See id.* at 1859. First, an administrative procedure is not available "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *See id.* Second, a procedure is not available when it is "so opaque that it becomes, practically speaking, incapable

22

of use." *See id.*  Finally, a procedure is unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misinterpretation, or intimidation." *See id.* at 1860.  However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018).  The Third Circuit recently established that:

> to defeat a failure-to-exhaust defense based on a misrepresentation by prison staff, an inmate must show (1) that the misrepresentation is one which a reasonable inmate would be entitled to rely on and sufficiently misleading to interfere with a reasonable inmate's use of the grievance process, and (2) that the inmate was actually misled by the misrepresentation.

*Hardy v. Shaikh*, 959 F.3d 578, 588 (3d Cir. 2020).

Defendants maintain that his retaliation claim against Defendant Williams is not properly before the Court because Plaintiff failed to exhaust it pursuant to the procedures set forth in DC-ADM 801.  (Doc. No. 119 at 19-20.)  In support of their argument, Defendants cite *Harris v. Ferguson*, No. 3:16-cv-1965, 2017 WL 3611752, at *3- 4 (M.D. Pa. Aug. 22, 2017), in which Judge Mariani concluded that the inmate-plaintiff had failed to exhaust, pursuant to DC-ADM 801, his claim that he was issued a misconduct in retaliation for his grievance.  Plaintiff, however, maintains that under DC-ADM 801, an inmate may "appeal an informal resolution

23

'only in those cases where the inmate believes that the sanction is disproportionate to the offense.'" (Doc. No. 123 at 14.)  Plaintiff avers, therefore, that "an inmate that his challenging the procedure of the informal resolution and alleging that a guilty plea was falsified would not have to make an appeal under DC-ADM 801." (*Id.* at 14-15.)

The DOC "has three (3) difference administrative remedy processes which collectively provide an inmate a route to challenge every aspect of confinement." *Shade v. Pa. Dep't of Corr.*, No. 3:16-cv-1635, 2020 WL 1891856, at *3 (M.D. Pa. Apr. 16, 2020).  One administrative remedy may not be substituted for the other. *See id.*  The Third Circuit has recently recognized that "there is a serious question whether . . . DC-ADM-801 and DC-ADM-804 are available to prisoners as a method to grieve retaliation claims." *See Grisby v. McBeth*, 810 F. App'x 136, 138 n.1 (3d Cir. 2020).  At issue in *Grisby* was the plaintiff's claim that he received a misconduct in retaliation for threatening to report an officer for "rudely den[ying] him a vegetarian meal." *Id.* at 137.  The Third Circuit noted "uncertainty regarding the interpretation of DC-ADM-801 and DC-ADM 804 and their interaction, if any, when it comes to retaliation claims." *Id.* at 138 n.1.

The undisputed record before the Court indicates that Plaintiff did not appeal his retaliation claim against Defendant Williams using the procedures set forth in

DC-ADM 801.  (Doc. No. 120 ¶¶ 41-48.)  However, in light of the Third Circuit's opinion in *Grisby*, the Court does not find that *Harris* is controlling authority entitling Defendants to summary judgment on the basis that Plaintiff did not exhaust his retaliation claim using the procedures set forth in DC-ADM 801.  Moreover, Defendants have not addressed the "serious question" regarding the interpretation of DC-ADM 801 and DC-ADM 804 and their interaction when it comes to retaliation claims.  Given this, the Court concludes that Defendants have failed to meet their burden of demonstrating lack of exhaustion, and the Court declines to grant summary judgment on this basis.

### 2.   Merits

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three (3) elements.  First, a plaintiff must prove that he was engaged in a constitutionally protected activity.  *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."  *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)).  This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights."  *Id.* (quoting *Suppon v. Dadonna*, 2013 F.3d 228, 235 (3d Cir. 2000)).  Third, a prisoner must prove that "his constitutionally protected conduct

was 'a substantial or motivating factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005). Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted that an inmate can satisfy this burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422. If the prison officials

26

can make this showing, it defeats the retaliation claim.  *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

Defendants assert that "the filing of a grievance would qualify as constitutionally protected activity" and that "the issuance of a misconduct and imposition of sanctions may be classified as an adverse action."  (Doc. No. 119 at 10.)  They argue, however, that Plaintiff's retaliation claim fails "because he cannot show that the filing of a grievance *motivated* Defendant Williams to take adverse action."  (*Id.*)  Defendants assert that Plaintiff's claim fails because: (1) the temporal proximity is not dispositive; (2) Defendant Williams did not issue the misconduct; (3) Plaintiff failed to allege facts stating a plausible reason why Defendant Williams would falsify informal resolution documentation; and (4) Defendant Williams would have imposed the same sanction regardless of Plaintiff's protected conduct.  (*Id.* at 11-17.)   Plaintiff maintains that summary judgment should be denied because material issues of fact exist.  (Doc. No. 123 at 8-14.)

While causation may be stablished by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence."  *Watson*, 834 F.3d at 422.  Thus, motivation is typically demonstrated by "evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that

27

suggests a causal link." *Id.* Here, the record reflects that Defendant Williams did

not issue Misconduct No. B067662. (Doc. No. 120 ¶ 27.) Plaintiff, however, argues

that Defendant Williams retaliated against him for filing grievances regarding the

phone system by falsely noting that Plaintiff had pled guilty to the misconduct and

by imposing the sanction of fourteen (14) days' phone restrictions. The Court

previously noted that Defendant Williams was aware of Plaintiff's protected activity

and that there was a close temporal proximity between the protected activity and

Defendant Williams' conduct. (Doc. No. 102 at 11-12.) The Third Circuit has noted

that even if discipline is initiated in retaliation for a protected act, due process is

satisfied, however, where the plaintiff has an opportunity to confront and challenge

the retaliatory misconduct report. *See Smith v. Mensinger*, 293 F.3d 641, 653-54 (3d

Cir. 2002); *see also Thomas v. McCoy*, 467 F. App'x 94, 97 (3d Cir. 2012) ("Due

process is satisfied where an inmate is afforded an opportunity to be heard and to

defend against the allegedly false misconduct reports.").

Plaintiff maintains that Defendant Williams' deposition testimony suggests

that he "may have falsified or otherwise coerced [Plaintiff's] supposed guilty plea to

misconduct." (Doc. No. 123 at 9.) Plaintiff is correct that the "Informal Resolution

Action Form," which bears his signature, makes no reference to a guilty plea and

only summarizes the sanctions imposed, as well as the start and end date for the

sanctions.  (Doc. No. 119-1 at 19.)  The Disciplinary Hearing Report, however, has typewritten text reading: INFORMAL RESOLUTION HEARING HELD THIS DATE INMATE PLEADS GUILTY TO CHARGES," with "14 days loss of phone 9/27/11—10/10/11" handwritten as the sanction.  (*Id.* at 20.)  The "guilty" box is checked under both the "Inmate Plea" and "Verdict" sections.  (*Id.*)

During his deposition, Defendant Williams testified that in 2011, "informal resolution was relatively new."  (Doc. No. 123-4 at 28.)  He indicated that an inmate's signature "basically" indicated an acceptance of understanding and the sanction.  (*Id.* at 29.)  Defendant Williams testified that the portion of the Disciplinary Hearing Report that was typed was a form that was provided and used to avoid "having to handwrite all that stuff."  (*Id.* at 43-45.)  He noted that the Disciplinary Hearing Report was not provided to inmates at the time, and that that form has "since gone away" and is not used anymore.  (*Id.* at 49-50.)  When asked, Defendant Williams doubted that an inmate "may be confused" and think that he was not pleading guilty and was just accepting a sanction.  (*Id.* at 47.)  He noted that Plaintiff had a "fairly significant misconduct history" and that "to characterize [Plaintiff] as being naïve or uninformed would probably not be a good description." (*Id.* at 48.)

Plaintiff also now denies any wrongdoing as set forth in Misconduct No. B067662.  (Doc. No. 124 ¶ 30.)  As Defendants point out, however, Plaintiff's assertion "is not supported by a signed declaration or any other evidence in the record." (Doc. No. 125 at 14.)  Upon review of the record, the Court concludes that Plaintiff has not demonstrated that there exists a genuine issue of material fact as to whether Defendant Williams' conduct was causally connected to Plaintiff's protected activity.   Plaintiff asserts that "the only explanation for Defendant Williams falsifying the informal resolution report and imposing sanctions that removed [his] phone privileges is retaliation for [his] constitutionally protected conduct" based upon "prison officials' and Defendant Williams' knowledge of [his] grievances related to the prison phone system."  (Doc. No. 123 at 12.)  Plaintiff's speculations, however, are simply insufficient to create a genuine issue of material fact to survive summary judgment.  *See Alexander v. Forr*, 297 F. App'x 102, 105 (3d Cir. 2008) (concluding that the district court properly granted summary judgment to defendants on inmate-plaintiff's retaliation claim because the inmate's "allegations of causation typically amount[ed] to no more than unsupported assertions; indeed, he often appear[ed] to rely on his unwarranted belief that causation is self-evident"); *see also Heyman v. Citimortgage, Inc.*, No. 14-1680, 2019 WL 2642655, at *16 (D.N.J. June 27, 2019) (noting that "[u]nsupported

30

allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment").

Even if Plaintiff sufficiently set forth a *prima facie* case, the Court concludes that Defendant Williams would still be entitled to summary judgment.  If a prisoner makes out a *prima facie* case, the burden shifts to prison officials to demonstrate that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  *Rauser*, 241 F.3d at 334. The Court must "evaluate . . . 'the quantum of evidence' of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion . . . afford[ed] [to] them." *Watson*, 834 F.3d at 426.  The Third Circuit has noted that "most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence. *Id.* at 425.

Upon review of the record, the Court agrees that there is no genuine issue of material fact regarding whether Defendant Williams would have made the same decision to sanction Plaintiff with fourteen (14) days' loss of phone privileges. Officer Slodysko's misconduct reports set forth that Plaintiff and inmate Henderson were swapping phone calls and that they ignored Officer Slodysko's orders to hang up the phones.  (Doc. No. 119-1 at 17, 22.)  Although Plaintiff now denies any

31

wrongdoing (Doc. No. 124 ¶ 30), he has submitted no evidence to support this assertion.  Moreover, the record reflects that inmate Henderson pled guilty to the misconduct and also received fourteen (14) days' loss of phone privileges.  (Doc. No. 119-1 at 20-21.)  Quite simply, Plaintiff "was punished for disobeying prison rules."  *Quiero v. Ott*, 799 F. App'x 144, 146 (3d Cir. 2020).  In the instant case, there is a sufficient quantum of evidence of misconduct to demonstrate that the discipline imposed upon Plaintiff was reasonably related to legitimate penological interests and that he would have been disciplined regardless of his grievances regarding the phone system.  *See Watson*, 834 F.3d at 426.  Accordingly, the Court will grant summary judgment to Defendants with respect to Plaintiff's First Amendment retaliation claim.

## B.    Eighth Amendment Claims

Plaintiff also alleges that Defendants Stetler and Shipe violated his Eighth Amendment rights by denying him water, personal hygiene supplies, clothing, and proper medical care while in the dry cell.  (Doc. No. 95 ¶ 19.)  Plaintiff claims that he "became ill, vomited, and lay in his own vomit for some of the time Plaintiff spent" in the dry POC.  (*Id.* ¶ 20.)  He told Defendants Stetler and Shipe that he was sick, but they took no action to get medical help despite observing Plaintiff vomit on himself.  (*Id.* ¶¶ 21-22.)

32

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. There are several types of Eighth Amendment claims, including claims alleging: denial of, or inadequate access to, medical care; exposure to adverse conditions of confinement; and the use of excessive force by prison guards. An Eighth Amendment claim includes both objective and subjective components. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. *See id.* The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind." *See id.*

In order to succeed on a claim as to one's conditions of confinement, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2015). "[T]he Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Therefore, conditions of imprisonment violate the Eighth Amendment only if they, "alone or in combination . . . deprive inmates of the minimal civilized measures of life's necessities." *See id.* at 347. Such necessities include "adequate food, clothing, shelter, and medical

care." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   Thus, "extreme deprivations are required to make out a conditions-of-confinement claim." *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  The Third Circuit has recognized that "even though administrative confinement in a dry cell is unpleasant and often unsanitary, so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020).

In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  In order to establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).  Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197.  The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard

"an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 842)).

The second prong of the Eighth Amendment inquiry is whether the plaintiff's medical needs were serious.  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  Not every condition is a serious medical need; instead, the serious medical need element contemplates a condition of urgency, namely, one that may produce death, degeneration, or extreme pain.  *See id.*

Upon review of the record, the Court concludes that there is no genuine issue of material fact from which a reasonable factfinder could conclude that Defendants Stetler and Shipe violated Plaintiff's Eighth Amendment rights.  The record does not support a finding that Defendants Stetler and Shipe deprived Plaintiff of water, personal hygiene supplies, and clothing.  Although the water and toilet in the dry cell were turned off pursuant to DOC policy (Doc. No. 120 ¶ 55), the "lack of

35

running water, without more, does not suffice to show an Eighth Amendment violation." *See Collier v. Martinez*, 474 F. App'x 870, 874 & n.4 (3d Cir. 2012). Moreover, Plaintiff has presented no evidence suggesting that Defendants Stetler and Shipe were responsible for providing these necessities to Plaintiff. *Cf. Abreu v. Ferguson*, No. 1:19-cv-20, 2020 WL 1271637, at *6 (M.D. Pa. Mar. 17, 2020) (citing *Thomas* to conclude that summary judgment was warranted where inmate-plaintiff did not provide evidence suggesting that the defendant had knowledge of alleged conditions of confinement in the dry cell). Notably, Plaintiff's medical records are devoid of any indication that he requested such necessities and was denied. (Doc. No. 119-1 at 139-46.)

Moreover, nothing in the record before the Court creates a genuine issue of material fact as to whether Defendants Stetler and Shipe were deliberately indifferent to Plaintiff's serious medical needs. While Defendant Stetler testified during his deposition that he could not recall "an investigation of [Plaintiff] or any medical care he received between October 19-21, 2011 (Doc. No. 119-1 at 135), Defendant Shipe testified that Plaintiff had been placed in a dry cell after officers suspected him of swallowing contraband (*id.* at 116). Defendant Shipe testified that he and Defendant Stetler interviewed Plaintiff in a medical conference room. (*Id.*) During the interview, Plaintiff said that he felt that he was going to throw up. (*Id.*)

36

Defendants Stetler and Shipe got him a trash can, and Plaintiff vomited in there. (*Id.*) Defendant Shipe testified that Plaintiff vomited liquid, and that it was "not like projectile vomiting with food and stomach acid coming out." (*Id.* at 119.) Defendant Shipe noted that it did not get on Plaintiff's clothes and that Plaitniff was not laying or sitting in any of his own vomit. (*Id.*) Moreover, Major Miller interviewed Defendants Stetler and Shipe about the incident, and they indicated that they provided Plaintiff "with material to clean [his] face and hands." (*Id.* at 101.)

Defendants maintain that Plaintiff's allegation that he vomited once "does not rise to the level of an objectively serious medical need that would be obvious to laym[en] as requiring immediate medical attention." (Doc. No. 119 at 6.) This Court agrees. "Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances (e.g., vomiting continuously for a long period of time, having blood in one's vomit, or the like), does not amount to an objectively serious medical condition." *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010); *see also Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1030 (10th Cir. 2020 (concluding that frequent vomiting, without the presence of blood, did not constitute a serious medical need); *Drouin v. Skallet*, No. 15-cv-3694-KAW, 2017 WL 2591281, at *5 (N.D. Cal. June 15, 2017) (collecting cases suggesting that "nausea and vomiting generally do not constitute a serious medical need"); *Maier v.*

37

*Lehman*, No. 13-6669, 2014 WL 7182116, at *8 (E.D. Pa. Dec. 16, 2014) (citing cases to conclude that vomiting does not rise to the level of a serious medical need). Plaintiff disagrees, stating: "Any reasonable fact finder could draw on personal experiences alone to conclude that vomiting is indicative of a serious medical need. Moreover, vomiting in any degree can directly lead to aspirating, choking, and ultimately, death."  (Doc. No. 123 at 6.)  However, as noted *supra*, Plaintiff's "[u]nsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Marinkovic*, 2019 WL 4600207, at *10.  Moreover, the record establishes that Defendants Stetler and Shipe provided Plaintiff a trash can to vomit in, and that they provided material for him to clean his hands and face with afterwards.  Furthermore, nothing suggests that Plaintiff lay in his own vomit in his cell, and there is no evidence that Plaintiff requested or required medical attention afterwards and that such attention was denied by Defendants Stetler and Shipe.

In response to Defendants' motion, Plaintiff asserts that while Defendants claim that the "record is devoid of any facts which could establish their deliberate indifference, . . . the only evidence that could support such an assertion would be their fortuitous lack of memory of the events at issue." (Doc. No. 123 at 6.)  Plaintiff argues that Defendants failed to provide any records which could have resolved the outstanding disputes of material fact, despite appropriate requests."  (*Id.* at 7.)

Specifically, he maintains that he sought all documents related to his time in the dry cell, and Defendants provided only misconduct records in response. (*Id.*) Plaintiff suggests that because these files were not provided, "the fact finder could make an adverse inference that Defendants either destroyed or withheld these documents because they contained information that would establish material facts in favor of [Plaintiff]." (*Id.*) Plaintiff argues further that even though Defendants indicated there were videos during the time period in question, they claimed they no longer existed despite a request for such videos to be produced. (*Id.*) Plaintiff alleges that "Defendants have always been on notice that the evidence they have destroyed, or otherwise failed to produce, could be subject to a civil action and preserved accordingly." (*Id.*)

Defendants assert that Plaintiff is not entitled to a finding of spoliation. (Doc. No. 125 at 4-5.) They maintain that Plaintiff's counsel "does not allege that he attempted to confer with [their] counsel to seek additional information," and he did not file a motion to compel. (*Id.* at 6.) Defendants argue that Plaintiff "mischaracterizes [their] statement, which was simply that POCs are equipped with cameras—Defendants did not state that any videos exist from [Plaintiff's] cell for the requested time period." (*Id.* at 7.) Defendants indicate that counsel "did not inquire as to the existence of a video when deposing Defendants Stetler and Shipe."

39

(*Id.*)  They maintain that the "record does not contain any facts to show their current recollection differs from the original version provided during the grievance process." (*Id.* at 9.)

Generally, a finding of spoliation is proper "when evidence is destroyed or altered, or when a party fails to preserve evidence in instances where litigation is pending or reasonably foreseeable." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)).  Moreover, under some circumstances, the nonproduction of evidence is also "rightfully characterized as spoliation" because "a party's failure to produce a document can have the same practical effect as destroying it."  *Id.* However, "a finding of bad faith is pivotal to a spoliation determination."  *Id.* at 79. Here, nothing before the Court demonstrates that Defendants have acted in bad faith such that a finding of spoliation and the imposition of sanctions, such as the denial of summary judgment and the provision of an adverse inference jury instruction, is warranted.  As noted *supra*, Plaintiff had not supported his assertions with a signed declaration or through any other evidence.  Nothing in the record creates a genuine issue of material fact as to whether Defendants Stetler and Shipe violated Plaintiff's Eighth Amendment rights by failing to provide water, hygiene materials, and clothing and by failing to provide medical care.  Accordingly, the Court will grant

40

summary judgment to Defendants with respect to Plaintiff's Eighth Amendment claim.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 118) will be granted.  An appropriate Order follows.

<u>s/ Sylvia H. Rambo</u>
United States District Judge

Date: January 14, 2021

41